OPINION OF THE COURT
David B. Saxe, J.
May a law firm be liable for failing to anticipate a new *626 development in the law, or for failing to protect its client against a future novel legal claim, the merit of which is unknown? Because I believe that it may not, I grant the defendant’s motion to dismiss.
This legal malpractice action is brought by the assignee of the rights of Credit du Nord (CdN), the former client of defendant law firm. The action revolves around a 1989 secured loan for $4.5 million, made by Credit du Nord to MCEG Productions, Inc. (Productions), and Productions’ repayment to CdN of more than $5 million in 1990. In 1992, Productions’ successor-in-interest, plaintiff MCEG Sterling, Inc. (Sterling), sued CdN in California Federal court, seeking to recover the more than $5 million which Productions had repaid on the loan. Its grounds for that action were that CdN’s security interest in the collateral for the loan had not been properly perfected by CdN.
No determination was made by the District Court on Sterling’s claim that CdN had not properly perfected its security interest on the loan. Rather, CdN (represented by different counsel) settled that action by paying Sterling $2.8 million and assigning to Sterling any claims which CdN may have had against defendant Phillips Nizer.
Pursuant to that assignment, Sterling now sues Phillips Nizer in this court on a claim of legal malpractice for its alleged failure to properly secure CdN’s security interest in the collateral for the loan.
Defendants now move, and plaintiff cross-moves, for summary judgment.
FACTS
In 1988, Productions sold to Viacom International the television and home video rights to three films under production: "Boris and Natasha,” "Limit Up” and "Getting It Right.” The August 1988 distribution agreement obligated Viacom to pay to Productions a guaranteed fee of $1.5 million for each of the three films, when completed and delivered. In order to finance the production of the three films, Productions initially took a loan from First Bank, and named First Bank as beneficiary under the completion bonds which guaranteed completion of the films. Productions also executed a copyright mortgage and assignment in favor of First Bank with respect to each of the three films on September 23, 1988. This document was recorded with the Copyright Office on October 4, 1988.
*627 On June 26, 1989, Productions executed an assignment in favor of Viacom confirming the transfer to Viacom of the television and home video rights to the three films as set forth in the 1988 distribution agreement. The assignment was recorded on June 30, 1989, in the Copyright Office.
On June 27, 1989, CdN made the $4.5 million loan to Productions. In connection with the loan, Productions, Viacom, CdN, and others executed a "Viacom Interparty Agreement,” confirming that one of the three films had been completed, that Viacom’s obligation to pay the $1.5 million by August 31, 1990 was absolute and unconditional, and the balance of the $4.5 million minimum guarantee by Viacom was subject only to Productions’ delivery of the other two films. In the Viacom Interparty Agreement, Productions assigned to CdN: "all of its right, title and interest in and to the payment of the Guarantees and such other sums which may hereafter become due to Productions pursuant to * * * the Distribution Agreement ('Assigned Receipts’) until Productions’ obligations (as defined in the Loan Agreement) to [CdN] are fulfilled,” and Productions irrevocably authorized and directed Viacom to pay the Assigned Receipts to CdN. In addition, the Viacom Interparty Agreement assigned to CdN Viacom’s rights to receive royalties under a sublicense by Viacom to Manson (another party to the Interparty Agreement) of home video exhibition rights (the Assigned Royalties). Further, the completion bonds issued with respect to the remaining two undelivered films were assigned to CdN, pursuant to a second Interparty Agreement of June 27, 1989.
CdN filed a UCC-1 financing statement with the California Secretary of State covering the collateral described in the security agreement.
First Bank executed and delivered UCC financing statement amendments which released all of First Bank’s security interests in the accounts, completion bonds, contract rights and other general intangibles relating to the television and home video exhibition of the three films. However, importantly, it expressly reserved all of First Bank’s security interests with respect to the copyrights and all rights therein other than the television and video exhibition rights.
Plaintiff concedes all these asserted facts, except that it asserts that CdN acquired a security interest in the three films.
DISCUSSION
The central question is whether, as a matter of law, Phillips Nizer failed to exercise due care in connection with the 1989 *628 loan by CdN to MCEG, by failing to properly perfect CdN’s security interests.
Although Phillips Nizer concededly filed a UCC-1 financing statement with the California Secretary of State covering the collateral described in the security agreement, the complaint alleges malpractice in its failure to record or file its security interest with the Federal Copyright Office. Plaintiff contends that security interests CdN obtained were in Productions’ copyrights and copyright interests in the three films, therefore it argues that the failure to perfect with the Copyright Office was a breach of duty by Phillips Nizer.
The documents submitted by defendants demonstrate on their face that CdN did not acquire any interest in the copyrights to the three films. As set forth above, the security for CdN’s loan consisted of accounts and royalties arising out of the television and video exhibition of the three films, certain contracts, and completion bonds on the two films still under production by MCEG at the time. The prior lender, First Bank, explicitly retained a security interest with respect to the copyrights for the films, therefore the copyrights were necessarily excluded from CdN’s security.
The only legal authorities relied upon by the plaintiff for the proposition that CdN should have filed or recorded their security interests in the Copyright Office as well are two published decisions arising out of Bankruptcy Court proceedings: In re Peregrine Entertainment (116 Bankr 194 [CD Cal 1990]) and In re AEG Acquisition Corp. (127 Bankr 34 [CD Cal 1991]).
The Peregrine case (supra) held that because the Federal Copyright Act preempts any State recordation system pertaining to interests in copyrights, the UCC article 9 framework for perfecting security interests does not apply to copyrights. In order to perfect a security interest in a copyright, that court therefore held a filing under the UCC is insufficient; the secured party must record the copyright with the Federal Copyright Office. To this extent, its holding is not questioned or problematic here. The problem arises because that court also applied its holding to related licenses and accounts receivable, on the rationale that they are integral to the copyright (see, In re Peregrine Entertainment, supra, at 199, 204; see also, In re AEG Acquisition Corp., supra). However, no legal authority held to that effect prior to Peregrine. Furthermore, ”[t]hese holdings are somewhat questionable because the assets in question were not themselves copyrights. A license and related receivable seem analogous to an installment note for the sale of *629 land. Security interests in such installment notes are perfected under the U.C.C., not under real property recording statutes” (Moore, Entertainment Bankruptcies: The Copyright Act Meets the Bankruptcy Code, 48 Bus Law 567, 571-572 [Feb. 1993]).
Not only is the Peregrine holding novel and questionable with regard to intangibles relating to copyrights, but in addition, it did not exist at the time of the loan in question. There was then no controlling or even advisory case law in existence which indicated that the accounts, royalties and contract rights at issue were a type of security interest which must be perfected by recording with the Copyright Office. Essentially, plaintiffs position is that notwithstanding the lack of any such legal obligation, CdN’s counsel had a duty to employ a "belt and suspenders” approach to perfecting, so as to prevent any possible legal challenge, regardless of whether any support existed for such a theoretical assault. "An attorney is liable in a malpractice action if it can be proved that his conduct fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of the profession [citation omitted]. However, an attorney is not held to the rule of infallibility and is not liable for an honest mistake of judgment where the proper course is open to reasonable doubt [citation omitted]. Thus, 'selection of one among several reasonable courses of action does not constitute malpractice’ (Rosner v Paley, [65 NY2d 736,] 738) * * * The general rule is that an attorney may be held liable for ignorance of the rules of practice, failure to comply with conditions precedent to suit, or for his neglect to prosecute or defend an action [citation omitted].” (Bernstein v Oppenheim & Co., 160 AD2d 428, 430 [1st Dept 1990].)
The obligation plaintiff seeks to impose upon defendants exceeds any duty the court may properly impose upon counsel; it would require them to anticipate future case law and to take all actions necessary to avoid any legal challenge, even if such challenge would be unsupported by legal authority then existing.
Based upon the conceded facts set forth in the defendants’ moving papers, I conclude that the defendants are entitled to summary judgment dismissing the complaint. I reject the plaintiffs argument regarding incomplete discovery; the items plaintiff claims to need cannot alter the foregoing analysis and conclusion.
Accordingly, the motion is granted, the cross motion is denied, and the action is dismissed.